Case Number:16-002244-CI

Filing # 39896136 E-Filed 04/05/2016 07:22:42 PM

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, FLORIDA
CIVIL DIVISION

BURTON W. WIAND, as Receiver for
TRI-MED CORPORATION and MILES E.
BLOUNT, RICHARD BURNHAM,
DEBORAH BURNHAM, KAREN A DEICH,
ROBERT McCLELLAN, MARIA
PAZIENZA, NICHOLAS SANDS, as
TRUSTEE OF THE LUCY G. SANDS
TRUST, JAMES WATERS, and ANTHONY
WILTEN,

     Plaintiffs,

                              Case No.

v.

STOEL RIVES LLP, JODI JOHNSON,
CHARLES CORCES, P.A., and CHARLES
CORCES,

     Defendants.

_____/

**RECEIVER'S COMPLAINT
AND INVESTORS' CLASS ACTION COMPLAINT**

    Burton W. Wiand (the "**Receiver**"), as Receiver for Tri-Med Corporation[1] ("**Tri-Med**"),

and Miles E. Blount, Richard Burnham, Deborah Burnham, Karen A. Deich, Robert McClellan,

Maria Pazienza, Nicholas Sands, as Trustee of the Lucy G. Sands Trust, James Waters, and

Anthony Witlin (collectively, the "**Named Investors**"), on behalf of themselves and all others

similarly situated, hereby file suit against Stoel Rives LLP ("**Stoel Rives**"), Jodi Johnson, Esq.

---

[1]    By orders dated March 5, 2014, May 13, 2014, September 30, 2015, and December 11, 2015, Mr. Wiand also was appointed Receiver for Tri-Med Associates Inc. ("**TMA**"), TMFL Holdings, LLC ("**TMFL**"), Interventional Pain Center, PLLC ("**IPC**"), and Rejuva Medical and Wellness Center, L.L.C., and Rejuva Medical Center, L.L.C. (collectively, "**Rejuva**") (Tri-Med, TMA, TMFL, IPC, and Rejuva are collectively referred to as the "**Receivership Entities**"), but he sues only on behalf of Tri-Med.

1

("**Johnson**"), Charles Corces, P.A. (the "**Corces Firm**"), and Charles Corces ("**Corces**") (collectively, "**Defendants**").

## PREFACE

1.      This action is filed to recover damages for Tri-Med and its investors from Defendants based on their participation in a Ponzi scheme orchestrated by, among others, Jeremy Anderson ("**Anderson**"), Anthony Nicholas, Jr. ("**Nicholas Jr.**"), and Anthony Nicholas, III ("**Nicholas III**) (collectively, the "**Tri-Med Principals**").   In addition to orchestrating the scheme alleged below, Anderson fled Florida for Minnesota, where he still resides, because there was an outstanding warrant for his arrest in Florida on charges of felony larceny.

2.      As set forth herein, the Receiver and/or the Named Investors assert the following claims against one or more Defendants: (1) recovery of fraudulent transfers under Florida Statues § 726 *et al.*; (2) unjust enrichment; (3) professional negligence/malpractice; (4) aiding, abetting, or participating in fraud; (5) aiding, abetting, or participating in breaches of fiduciary duties; (6) aiding, abetting, or participating in conversion; (7) civil conspiracy; (8) breach of contract; and (9) negligence.

3.      The Named Investors assert claims on behalf of a class of similarly situated investors.

## PARTIES

4.      Plaintiff Receiver is a citizen of the State of Florida and resides in Pinellas County, Florida.

5.      The Receiver was appointed by the Circuit Court for the Sixth Judicial Circuit in Pinellas County to serve as Receiver for Tri-Med by an Order dated March 5, 2014 (the "**Order Appointing Receiver**").   The Court entered the Order Appointing Receiver in an enforcement action brought by Florida's Office of Financial Regulation ("**OFR**") styled, *State of Florida,*

2

*Office of Financial Regulation v. Tri-Med Corp., et al.,* Case No. 14-001695-CI (the "**OFR Proceeding**"). The Receiver was appointed pursuant to Florida Statutes Section 517.191(2) and the Court's inherent equity powers, including the powers to carry out the purposes of the OFR Proceeding.

6. Under the Order Appointing Receiver and subsequent orders expanding the Receivership, to carry out OFR's mandates, the purposes of the OFR Proceeding, and the obligations and duties imposed on receivers by law, the Court directed the Receiver, among other things, to hold and manage the assets and properties of the Receivership Entities, to marshal and safeguard all such assets and properties, and to seek the imposition of constructive trusts as appropriate. The Court also conferred on the Receiver the power and authority to assert and prosecute claims, actions, suits, and proceedings that may have been or that may be asserted or prosecuted by Receivership Entities.

7. Tri-Med is a Florida corporation, and at the time of the events alleged in this Complaint, its principal place of business was located at 34931 US Highway 19, Suite 104, Palm Harbor, Florida 34684. As such, Tri-Med was located in and conducted its operations from Pinellas County, Florida.

8. Plaintiff Miles E. Blount is a resident of Hillsborough County, Florida. Mr. Blount invested $250,000 and lost approximately $247,867 in connection with his investment in Tri-Med.

9. Plaintiffs Richard Burnham and Deborah Burnham are husband and wife and are residents of DeSoto County, Florida. Mr. and Mrs. Burnham jointly invested $240,000 and lost approximately $231,503 in connection with their investment in Tri-Med.

3

10.     Plaintiff Karen A. Deich is a resident of Palm Beach County, Florida.  Ms. Deich and her recently deceased husband, Paul Deich, invested $631,000 and lost approximately $550,130 in connection with their investment in Tri-Med.

11.     Plaintiff Robert McClellan is a resident of Marion County, Florida. Mr. McClellan invested $505,000 and lost approximately $465,936 in connection with his investment in Tri-Med.

12.     Plaintiff Maria Pazienza holds a power of attorney for Teodora Pazienza. Ms. Maria Pazienza is a resident of Hernando County, Florida.  Ms. Teodora Pazienza invested $135,000 and lost approximately $128,202 in connection with her investment in Tri-Med.

13.     Plaintiff Nicholas Sands is the Trustee of the Lucy G. Sands Trust.  Mr. Sands is a resident of Orange County, Florida.  The Lucy G. Sands Trust invested $848,300 and lost approximately $731,174 in connection with its investment in Tri-Med.

14.     Plaintiff James Waters is a resident of Sumter County, Florida.  Mr. Waters invested $10,000 and lost approximately $9,772 in connection with his investment in Tri-Med.

15.     Plaintiff Anthony Witlin is a resident of Pinellas County, Florida.  Mr. Witlin is the President of LBC, LLC.  Mr. Witlin, individually and through LBC, LLC, invested $418,261 and lost approximately $403,754 in connection with his investment in Tri-Med.

16.     As discussed herein, the Named Investors seek certification of a plaintiff class consisting of all the investors who made investments in Tri-Med.

17.     Defendant Stoel Rives LLP is limited liability partnership organized under the laws of the State of Oregon.  It does not have an office in Florida.

18.     Defendant Jodi Johnson is an individual who resides in the State of Minnesota. She is a partner at Stoel Rives and the primary agent through which Stoel Rives facilitated and

aided and abetted the fraud perpetrated by the Tri-Med Principals and others.  She is not admitted to practice law in Florida.

19.     Defendant Charles Corces, P.A. is a professional association organized under the laws of the State of Florida.  It was retained by Tri-Med in April 2013 to serve as an escrow agent and hold funds earmarked for investors, lenders, or to fund medical procedures.

20.     Defendant Charles Corces is an individual who resides in the State of Florida.  He is currently a principal at Charles Corces, P.A., and primarily responsible for the engagement with Tri-Med.

21.     Non-parties Anderson, Nicholas, III, Nicholas, Jr., Eric Ager, Irwin Ager, and Teresa Simmons Bordinat, a/k/a Teresa Simmons (collectively, the "**Insiders**") along with others used the Receivership Entities to defraud approximately 230 investors, including the Named Investors, from at least October 2011 forward by making material misrepresentations and omissions to lure investors into their fraudulent investment scheme.  The Insiders have refused to answer substantive questions and invoked their Fifth Amendment right against self-incrimination during depositions taken in connection with OFR's enforcement action.

## JURISDICTION AND VENUE

22.     This is an action for damages in excess of $15,000, exclusive of interest, costs, and attorneys' fees.

23.     This Court has personal jurisdiction over non-resident Defendants Stoel Rives and Johnson under the Florida Long Arm Statute because, among other things and as alleged herein, Stoel Rives and Johnson conducted continuous and systematic business in Florida for approximately 18 months and committed torts in Florida.  Specifically, from October 2012 to March 2014, Stoel Rives and Johnson provided legal services to Tri-Med, including regarding its

offering of securities in Florida, and more specifically, regarding whether its offer and sale of "Monthly Income Agreements" complied with Florida and federal securities laws. Stoel Rives and Johnson also counseled, advised, and assisted principals of Tri-Med with other matters in Florida, including: (1) forming a joint venture to purchase real estate with Tri-Med investor funds in Florida; (2) preparing security agreements, promissory notes, and UCC filings for loans made with Tri-Med investor funds to third-party companies located in Florida; (3) drafting employment agreements for employees of Tri-Med; (4) drafting and revising residential leases in Florida for Nicholas Jr.; (5) communicating with investor(s) in Florida concerning Tri-Med; and (6) responding to subpoenas on behalf of Tri-Med to Florida regulators.

24.     While providing these legal services to Tri-Med, Stoel Rives and Johnson engaged in extensive contacts with Tri-Med and its personnel in Pinellas County, Florida, including Nicholas Jr. and Nicholas III. These contacts assisted and perpetuated the fraudulent scheme described herein and give rise to Plaintiffs' causes of action. Based upon their general and specific contacts with the State of Florida, Stoel Rives and Attorney Johnson purposely availed themselves of the privilege of conducting activities within Florida and have established minimum contacts with the State of Florida.

25.     Although Stoel Rives and Johnson provided extensive legal services in Florida and relating to Florida law, Johnson was not licensed to practice law in Florida and Stoel Rives had no office in Florida or Florida-licensed attorney working on any of the matters, and therefore they both engaged in the unauthorized practice of law.

26.     Defendant Corces Firm is a professional association organized under the laws of the State of Florida. Its principal place of business is located in Hillsborough County, Florida.

27.     Defendant Corces is an individual who resides in and is a citizen of the State of Florida.  Upon information and belief, he resides in Hillsborough County.

28.     Venue is proper in this circuit as this action is related to the OFR Proceeding pending in this Circuit, the fraudulent investment scheme underlying this case occurred in this Circuit, and the Receiver was appointed in this Circuit.  As such, the causes of action asserted in this case accrued in Pinellas County, Florida.  Further, as the Court that appointed the Receiver, pursuant to Florida Statutes Section 517.191(2), this Court has jurisdiction over any claims brought by the Receiver.

## OVERVIEW OF THE FRAUDULENT SCHEME
## AND THE DEFENDANTS' ROLES

29.     From October 2011 through March 2014, the Insiders raised approximately $17.6 million through Tri-Med from approximately 230 investors as part of a single and continuous fraudulent scheme (the "**scheme**").  They misappropriated the vast majority of that money, including for their and others' personal benefit.  Following a lengthy evidentiary hearing on October 22, 2014, this Court found that "**[t]he whole series of introduction of evidence and testimony in this case is highly suggestive of numerous criminal offenses that [the Insiders] might be fearful of from tax evasion to securities violations to fraud and theft, et cetera, et cetera.**"  The Court further found that "**the evidence is clear and convincing and reaches a very high level that this was a fraudulent scheme to steal people's money.**"

30.     The Tri-Med investment scheme essentially involved the purported purchase of medical accounts receivable generated from treatment of accident victims.  For example, a person injured in a car accident will sometimes retain a personal injury attorney, seek medical treatment from a doctor that focuses on treating accident victims, try to negotiate a settlement for personal injury benefits under the victim's own auto insurance policy and/or for payment under

7

the insurance policy of any other person involved in the accident, and then file a lawsuit, if necessary.  The doctor accrues a receivable in the amount charged for the treatment provided to the injured patient and obtains a letter of protection ("**LOP**").  An LOP is a contract involving the patient, the patient's attorney, and the medical services provider pursuant to which the patient and attorney agree to pay all or part of the total billed by the medical services provider from the proceeds of any pre-suit settlement, lawsuit settlement, or judgment the patient may obtain in connection with the accident.

31.    As part of its investment scheme, Tri-Med Principals claimed to purchase LOPs on behalf of Tri-Med at purported discounts to their face values from accident injury clinics and other medical service providers.  This allowed the providers to be paid some amount of money without waiting for the resolution of the patients' insurance claims or litigation.  Tri-Med purportedly accomplished such purchases through a document referred to as an "Assignment of Medical Receivables."

32.    Tri-Med raised money from investors to purportedly purchase LOPs by issuing securities.  Tri-Med Associates, Inc. ("**TMA**") was the so-called "marketing arm" of Tri-Med and focused on soliciting investors for Tri-Med's "investment program."  Insiders purposely targeted the elderly and fraudulently likened Tri-Med's "investment program" to certificates of deposit to make it seem like a very safe option for people seeking a fixed-income investment.  In return for an investment in Tri-Med, each investor was promised (1) an assignment of at least one LOP, depending on the amount of the investment; (2) payment to the investor of "interest" ranging from 5.75% to 8%; and (3) the return of the investor's principal investment once the medical receivable backed by the LOP purportedly assigned to that investor was paid or at the expiration of two years, whichever occurred first.

33.     Insiders misrepresented to investors and potential investors on Tri-Med's website, in investor agreements, and in flyers that the Tri-Med investment was "registered with and operates as an exempt security, as reviewed by the [OFR]" or similar false language.  The Tri-Med investment was never registered with OFR, and OFR has never given any indication that it was exempt from registration.

34.     Insiders also included a "legal opinion letter" purportedly authored by an attorney from the Florida law firm Broad & Cassel in the materials they used to solicit investors.  This letter purports to provide a legal opinion that the Tri-Med securities offered and sold by Insiders were exempt from registration with Florida and federal securities regulators.  This letter, however, is a forgery and neither Tri-Med nor any Insider was ever a client of Broad & Cassel.

35.     Similarly, Insiders provided a document entitled "Legal Principals of Trimed Corporation" to potential investors, in which they claimed "John A. Schifino" served as Tri-Med's "Securities Attorney."  Not only does Attorney Schifino not practice securities law, but he has never represented Tri-Med or any of the Insiders in any capacity.   Additional material misrepresentations and omissions were made to investors and potential investors.

36.     Non-party Steven Marlowe and his firm, Marlowe McNabb Manchnik, P.A. (f/k/a Marlowe McNabb, P.A.), (collectively, "**Marlowe**") were responsible for holding investors' money in trust pending the purchase of LOPs.  At the inception of the scheme, Marlowe wrote a letter to Tri-Med in which he represented that "[a]ll funds received by or through Tri Med from investors will be deposited into a Marlowe McNabb Trust Account established for this purpose" and that Marlowe McNabb would "pay medical providers for the LOPs."  Tri-Med provided that letter to investors, and investors relied on Marlowe's representations in making their investment decisions.  In other similar letters, Tri-Med told investors that "your funds have been placed in an

9

FDIC Insured Trust Account under the control and direction of one of Florida's most respected law firms, Marlowe McNabb P.A…."

37.     During the entirety of the scheme, however, only approximately $2.8 million of the more than $17.6 million raised from investors was deposited in trust with Marlowe.  Insiders diverted the vast majority of the money invested in Tri-med for their personal and others' benefit (*see infra* ¶¶ 89-129).

38.     Tri-Med purportedly assigned LOPs to investors through a document referred to as an "Assignment of Interest" certificate.  Every Tri-Med investor received at least one of these certificates.  Each Assignment of Interest certificate identified (1) the LOP the investor's funds purportedly were used to purchase, which was identified by an alphanumeric code; (2) the purported value of the LOP or interest therein; and (3) the name of the insurance company that purportedly guaranteed the underlying medical receivable.  This information was false.

39.     Further, those certificates represented to investors that each letter of protection "**ACTS AS AN INDISPUTABLE LIEN UPON THE INDIVIDUAL CASE IT REPRESENTS**" (original emphasis).  As a matter of law, however, the certificates did not constitute valid assignments because, among other reasons, the investors never took ownership of the underlying LOP.  As such, that representation to investors was false.

40.     To underscore the purported safety of the "investment program," the certificates also represented that the LOPs were "secured," "guaranteed," or "backed" by major insurance companies.  In reality, the LOPs were not secured, guaranteed, or backed by anything.  The LOPs were merely agreements between medical providers, patients, and their attorneys that gave the medical providers some right to receive payment for all or part of their services from any

money patients might receive in connection with settlements or judgments.   As such, this representation to investors also was false.

41.     In some cases, investors (including the Named Investors) received Assignment of Interest certificates that purported to assign LOPs that did not even exist.   Insiders and others prepared and signed these certificates.   Insiders fabricated dozens of LOPs, and instead of purchasing medical receivables, they used investors' money to enrich themselves and others, purchase real estate, and fund unrelated business ventures.   Again, these representations to investors were false.   Even when Tri-Med actually purchased LOPs, many of them prohibited the relevant medical provider from transferring or assigning them to Tri-Med or Tri-Med's investors. Investors were not informed of this fact.   Nevertheless, the certificates purported to assign these restricted LOPs to investors.

42.     Investors relied upon these misrepresentations in connection with their participation in Tri-Med's "investment program."

43.     On or about April 5, 2013, Tri-Med retained Defendant Corces to serve as an escrow agent.   The parties executed an Escrow Agreement, which is attached hereto as **Exhibit A**.

44.     The Escrow Agreement provides that Tri-Med "has received, and anticipates receiving in the future, funds from investors and/or lenders which the Company will use to finance certain medical procedures and surgeries."   It further provides that Tri-Med "will receive payment from certain medical providers for the funding of medical procedures and surgeries," and that Tri-Med "desires that the repayments received from medical providers not be comingled with other Company funds."

45.     During the tenure of the Corces Firm and, before that, the tenure of the Corces Firm's predecessor in this role, Brian Stayton and his law firm Stayton Group, P.A. (collectively, "**Stayton**"), as alleged in detail below, the Named Investors received 37 bogus Assignments of Interest in connection with their respective investments.

**Plaintiff Nicholas Sands, as Trustee of the Lucy G. Sands Trust**

46.     Plaintiff Nicholas Sands, as Trustee of the Lucy G. Sands Trust, received twenty false "Assignment[s] of Interest" on or about November 2, 2012, January 17, 2013, February 8, 2013, May 9, 2013, September 3, 2013, and October 7, 2013.  While these assignments identified a purported LOP number, the underlying medical receivables do not exist, and the LOPs were forgeries.

47.     Moreover, the certificates represented to Plaintiff Sands that these purported assignments were "backed" by fifteen different insurance companies, including Allstate Insurance, General Casualty, Comm. Liab. Ins.-Dollar General, Direct General Ins., AETNA, Safeco Insurance, Gainsco Insurance, Mercury Insurance Co., Hartford Ins. Co., MetLife Auto & Home, Peak Casualty, Unitrin Direct Insurance, 21st Century Insurance, USAA Insurance, and Progressive Insurance, but those representations were false.

48.     Marlowe and the Insiders represented to Plaintiff Sands that Marlowe McNabb would hold the Trust's money in escrow pending Tri-Med's use of the Trust's purported investment to purchase LOPs.  Instead of buying LOPs, however, the Tri-Med Principals used the Trust's investment, in part, to make cash payments to Insiders, to fund a loan to an unrelated company for the purported development of medical software, and to purchase real estate.

**Plaintiff Karen A. Deich**

49.     Plaintiff Karen Deich received six false "Assignment[s] of Interest" on or about December 19, 2012, April 23, 2013, December 3, 2013, and November 6, 2013.  While these assignments identified a purported LOP number, the underlying medical receivables do not exist, and the LOPs were forgeries.

50.     Moreover, the certificates represented to Plaintiff Deich that these purported assignments were "backed" by Florida Ins. Guarantee Assoc., Mercury Insurance Co., 21st Century Insurance Acceptance Insurance, Infinity Ins. Co., and Direct General Ins., but those representations were false.

51.     Marlowe and the Insiders represented to Plaintiff Deich that Marlowe McNabb would hold her money in escrow pending Tri-Med's use of her purported investment to purchase LOPs.  Instead of buying LOPs, however, the Tri-Med Principals used Plaintiff Deich's investment, in part, to make cash payments to Insiders, to fund a loan to an unrelated company, to purchase real estate, and to keep property owned by Nicholas, Jr., from being foreclosed.

**Plaintiffs Richard and Deborah Burnham**

52.     Plaintiffs Richard and Deborah Burnham received two false "Assignment[s] of Interest" on or about February 18, 2013, and April 23, 2013.  While these assignments identified a purported LOP number, the underlying medical receivables do not exist, and the LOPs were forgeries.

53.     Moreover, the certificates represented to Plaintiffs Richard and Deborah Burnham that these purported assignments were "backed" by Hartford Ins. Co and Gainsco Insurance, but those representations were false.

13

54.    Marlowe and the Insiders represented to Plaintiffs Richard and Deborah Burnham that Marlowe McNabb would hold their money in escrow pending Tri-Med's use of their purported investment to purchase LOPs.   Instead of buying LOPs, however, the Tri-Med Principals used the Burnhams' investment, in part, to make cash payments to Insiders and to fund a loan to an unrelated company.

**Plaintiff Anthony Witlin**

55.    Plaintiff Anthony Witlin received four false "Assignment[s] of Interest" on or about October 7, 2013.   While these assignments identified a purported LOP number, the underlying medical receivables do not exist, and the LOPs were forgeries.

56.    Moreover, the certificates represented to Plaintiff Witlin that these purported assignments were "backed" by 21st Century Insurance, Auto Owners Ins., Gainsco Insurance, and Farmers Insurance, but those representations were false.

57.    Marlowe and the Insiders represented to Plaintiff Witlin that Marlowe McNabb would hold his money in escrow pending Tri-Med's use of his purported investment to purchase LOPs.   Instead of buying LOPs, however, the Tri-Med Principals used Plaintiff Witlin's investment, in part, to purchase real estate.

**Plaintiff Robert McClellan**

58.    Plaintiff Robert McClellan received four false "Assignment[s] of Interest" on or about April 23, 2013, May 9, 2013, and November 6, 2013.  While these assignments identified a purported LOP number, the underlying medical receivables do not exist, and the LOPs were forgeries.

59.     Moreover, the certificates represented to Plaintiff McClellan that these purported assignments were "backed" by Peak Casualty, Geico Ins., Unitrin Direct Insurance, and MetLife Auto & Home, but those representations were false.

60.     Marlowe and the Insiders represented to Plaintiff McClellan that Marlowe McNabb would hold his money in escrow pending Tri-Med's use of his purported investment to purchase LOPs.   Instead of buying LOPs, however, the Tri-Med Principals used Plaintiff McClellan's investment, in part, to make cash payments to Insiders and to fund a loan to an unrelated company.

**Plaintiff Miles Blount**

61.     Plaintiff Miles Blount received one false "Assignment of Interest" on or about November 6, 2013.  While this assignment identified a purported LOP number, the underlying medical receivable does not exist, and the LOPs was a forgery.

62.     Moreover, the certificate represented to Plaintiff Blount that this purported assignment was "backed" by 21st Century Insurance, but that representation was false.

63.     Marlowe and the Insiders represented to Plaintiff Blount that Marlowe McNabb would hold his money in escrow pending Tri-Med's use of his purported investment to purchase LOPs.   Instead of buying LOPs, however, the Tri-Med Principals used Plaintiff Blount's investment, in part, to purchase real estate.

64.     As these purported investments by the Named Investors demonstrate, the Insiders used the majority of the money they raised through Tri-Med for improper purposes, including but not limited to, converting the money for the Insiders' and others' personal use; funding businesses owned and/or controlled by Anderson, Nicholas Jr., and/or Nicholas III; paying illegal commissions; purchasing real estate; and providing "loans" to third parties, including

family members and others associated with the scheme.  As alleged in more detail below (*see infra* ¶¶ 89-129), Stoel Rives and Johnson knowingly and substantially assisted the Insiders to divert the investors' money to these improper purposes.

65.     The Insiders' conduct was so irregular and suspicious it caused Bank of America, the bank they used to operate the purported "investment program" in 2011 and 2012, to unilaterally freeze Tri-Med's accounts and other related accounts in the fall of 2012.  The bank notified Insiders that "[b]ased on a careful review of the account[s], we have made the decision that the funds will not be remitted to you."  Although the bank later remitted the money to Insiders, it barred them from continuing to do business at the bank.

66.     Thereafter, Insiders distributed a "2012 Investors Newsletter" to Tri-Med investors, which falsely informed investors that Tri-Med voluntarily elected to change its banking relationship from Bank of America to Wells Fargo because of the "government's billion dollar fraud suits looming against them."  The Insiders further stated in their "2012 Investors Newsletter," "we simply did not feel their business was continuing to be safe enough to be involved with our business."

## DEFENDANTS HAD ACTUAL KNOWLEDGE OF AND SUBSTANTIALLY ASSISTED THE INSIDERS' FRAUD

67.     The Insiders touted their relationships with Defendants and other professionals to investors to assure the investors that Tri-Med's "investment program" was safe and that their money was protected by prominent attorneys or accountants.  For example, in their "2012 Investors Newsletter," the Insiders wrote in reference to Stoel Rives, "We now retain a new nationwide law firm with over 400 attorneys across the country.  We have lots of lawyers in lots of states, that equals lots of safety checks from lots of folks, but that's ok with us!"

68.     In addition, Tri-Med sales agents sent investors a form letter in which Anderson falsely represented to investors, "Your funds have been placed in an FDIC Insured Trust Account under the control and direction of one of Florida's most respected law firms, Marlowe McNabb P.A." By lending their imprimaturs and professional reputations to Tri-Med's scheme, Defendants helped the Insiders steal millions of dollars from hundreds of investors.

**Stoel Rives And Johnson Knew The Insiders Were Operating A Fraudulent Scheme Through Tri-Med.**

69.     Despite the fact that it did not have an office in Florida and that Johnson was not admitted to practice law in Florida, Anderson caused Tri-Med to retain Stoel Rives on or about October 25, 2012.  Neither Stoel Rives nor Johnson performed any due diligence on Anderson. If they had, they would have discovered Anderson's outstanding arrest warrant for felony larceny.  Shortly after its engagement, Stoel Rives began reviewing documents from Anderson relating to Tri-Med, including sample "Monthly Income Agreements," assignments of medical receivables, and LOPs.  Stoel Rives conferred with Anderson about Tri-Med and its investment program and conducted research into Tri-Med's compliance with state and federal securities laws.

70.     On or about December 7, 2012, Stoel Rives provided to Anderson a comprehensive memorandum regarding the application of Florida and federal securities laws to Tri-Med's purported investment program (the "**Stoel Rives Memo**").  The Stoel Rives Memo began with a summary of Tri-Med's operations.  It acknowledged that Tri-Med "engaged in the business of purchasing letters of protection from surgical centers or other providers of medical care … in Florida," and that as of December 2012, Tri-Med had offered and sold "Monthly Income Agreements" to over 100 investors, raising a total of $7 million.

71.     According to the Stoel Rives Memo, however, all of that activity violated state and federal securities laws, including the anti-fraud provisions, by, among other things, not providing full and fair disclosure of information to investors; making inaccurate or misleading representations; advertising the Tri-Med "investment program" in newspapers and on Tri-Med's website; failing to register the securities and certain entities and individuals with pertinent regulators; and paying unlawful commissions to sales agents.

72.     In fact, the Stoel Rives Memo bluntly notified Insiders that:

> **Tri-Med and its principals have potential exposure to liability for claims by purchasers, as well as exposure for sanctions by Federal securities regulators.**

It also explained that:

> **[u]ntil the Investors are repaid in full, the only way to eliminate the potential claims by purchasers would be to conduct a rescission offer to all prior purchasers who purchased** [investments from Tri-Med].

The Stoel Rives Memo warned that, "**Florida securities regulators could impose sanctions, require a rescission offer or pursue other civil or criminal liabilities,**" and concluded, "**Tri-Med should discontinue all offers and sales of [investments] … immediately.**"

73.     Incredibly, instead of disclosing the Insiders' fraud to investors, to another Tri-Med officer, to regulators, or to law enforcement; or insisting Tri-Med rescind the investments; or even withdrawing from its representation of Tri-Med, Stoel Rives and Johnson continued their representation of Tri-Med and took affirmative steps to ensure that Tri-Med could continue operating and that investors never learned of the Insiders' fraud.  And of course, they continued to accept fee payments they knew originated from defrauded investors.

74.     Specifically, in December 2012, Johnson and Stoel Rives began working on a private placement memorandum (the "**PPM**") intended to allow Tri-Med to raise additional

money from investors.   The PPM supposedly would have provided investors with more information about Tri-Med, its principals, and the risks associated with its "investment program," but it would not have disclosed the Insiders' fraud or Tri-Med's violations of state and federal securities laws.  It also would not have disclosed the fact that Anderson was wanted in Florida on charges of felony larceny.  The omission of such facts, which would indisputably be material to a reasonable person's investment decision, constitutes yet another layer of securities fraud in Tri-Med's "investment program."  Despite being aware the Insiders committed fraud through Tri-Med and purportedly preparing a PPM, Stoel Rives and Johnson performed no or inadequate due diligence on the Insiders and their fraud.  And the PPM would have done nothing to rectify matters for all of the investors who, according to Stoel Rives own analysis, already had been defrauded.

75.    As the Insider's fraud continued, so too did Stoel Rives' and Johnson's facilitation of their wrongdoing.  For example, in May 2013, Stoel Rives and Johnson conducted extensive research regarding problems with LOPs under Florida law, including (1) difficulties securing payment of LOPs; (2) questions concerning the enforceability of LOPs; (3) obligations of attorneys with regard to LOPs; (4) whether constructive trusts apply to LOPs; (5) the ability (or lack thereof) to assign rights to personal injury settlements; and (6) whether a non-medical professional can obtain an ownership interest in a medical professional association.  According to Stoel Rives' time records, Johnson considered strategy and collection options regarding LOPs and advised Anderson of her conclusions.   Clearly, Stoel Rives and Johnson recognized problems concerning Tri-Med's ability to enforce the LOPs under Florida law.  These problems, however, were never disclosed to investors.

76.   In addition, Stoel Rives and Johnson knew that sales agents were using Stoel Rives' name and the names of its lawyers to confirm the purported legitimacy of Tri-Med's "investment program," but they took no action to stop that practice.   In fact, at least three investors contacted Stoel Rives beginning in June 2013 to discuss their potential investments in Tri-Med.   Despite the Stoel Rives Memo it authored in December 2012, which advised that Tri-Med securities should no longer be sold, Stoel Rives and Johnson had actual knowledge that the Insiders disregarded their advice and were continuing to sell unregistered securities in violation of Florida and federal laws.

77.   For example, Johnson received a call from an investor on September 9, 2013, wherein the investor requested she "provide him more information about Tri Med and the investment…."   Johnson did not speak with this investor; rather, she referred the investor to Anderson – a man with an outstanding felony arrest warrant whom Johnson and Stoel Rives knew had already defrauded investors – regarding the investor's inquiry.

78.   On September 12, 2013, just three days later, Johnson spoke with Plaintiff Waters, who was referred to her by a Tri-Med sales agent, about an investment in Tri-Med. According to Johnson, Plaintiff Waters "wanted to know what advice I was providing to Tri Med to protect the investors…."   Johnson, however, failed to disclose to Mr. Waters any of the fraud outlined in the Stoel Rives Memo or even to simply inform him that Tri-Med should not be offering or selling investments because it was doing so illegally.   Instead, Johnson told Mr. Waters that she would speak with the principals of Tri-Med, whom she knew had defrauded investors like Mr. Waters, so that they could contact him directly.   Mr. Waters ultimately invested with Tri-Med the following month.   He lost approximately 97% of his initial investment.

79.     These facts demonstrate Stoel Rives and Johnson knew Tri-Med was continuing to sell securities despite the Stoel Rives Memo it authored informing the Insiders they were engaged in securities fraud and needed to cease their activities and take additional steps. Stoel Rives and Johnson did not take any action in the best interests of Tri-Med, including but not limited to, withdrawing from representation; disclosing the ongoing fraud to innocent officers of the company, including its Chief Information Officer, Ravi Patel; or disclosing the ongoing fraud to regulators or law enforcement. To the contrary, Stoel Rives continued to represent Tri-Med, to provide legal services to Insiders, and to be knowingly paid for such services with defrauded investors' money until the Receiver was appointed in March 2014.

**Corces And The Corces Firm Knew The Insiders Were Operating A Fraudulent Scheme Through Tri-Med.**

80.     As alleged above, Corces and the Corces Firm's Escrow Agreement required Corces to obtain written evidence from Anderson or Nicholas III in connection with any disbursement that "will enable the Escrow Agent to attribute the disbursement to a particular investor and/or lender, or the funding of a particular medical procedure." Corces did not have discretion to distribute funds held in the escrow account.

81.     Despite only having the authority to distribute funds to investors or lenders or to fund medical procedures, at the direction of a Tri-Med Principal, Corces issued five (5) checks from the escrow account to Tim Patrick Enterprises between August 2013 and December 2013 for purported professional services Tim Patrick ("**Patrick**") provided to Tri-Med. Corces, however, knew that Tim Patrick Enterprises was not an investor, lender, or provider of medical services and that Tri-Med Principals were willing to transfer money to improper recipients. In total, Corces and his firm paid Tim Patrick Enterprises $37,000 for its purported services.

82.     Tri-Med employed Tim Patrick as a "risk management officer," which required him to, among other things, purportedly evaluate and negotiate the proposed LOPs to be purchased by Tri-Med.  He played an integral part in the scheme to defraud investors, including but not limited to, approving and executing bogus "Assignment of Interest" certificates that were sent to Tri-Med's investors in connection with their respective investments.

83.     In addition, Corces elected to use the escrow account to improperly pay the Corces Firm for its purported role as Escrow Agent again at the direction of a Tri-Med Principal. On October 23, 2013, Corces issued a check from the escrow account to Charles Corces, P.A. for $4,737.50.  The Corces Firm was not paid from Tri-Med's operating account, but rather from funds that were earmarked for investors, lenders, and/or to fund medical procedures.  As a result, once again Corces knew that Tri-Med Principals were willing to transfer investors' money to improper recipients.

84.     Corces and his firm did not receive any written evidence from Anderson or Nicholas III that would "enable the Escrow Agent to attribute the disbursement to a particular investor and/or lender, or the funding of a particular medical procedure" in connection with the disbursements to Charles Corces, P.A. and Tim Patrick Enterprises.

85.     Corces and his firm knew it was improper to use the funds held in trust to pay Charles Corces, P.A. and Tim Patrick Enterprises and that Tri-Med Principals were willing to approve such misconduct.

86.     Indeed, on November 25, 2013, Corces sent an email to Anderson, which stated:

I must admit I am more than a little concerned with the activity and status of the Tri-Med Escrow Account over which I am operating pursuant to the provisions of an Escrow Agreement.  Some time ago you represented to me that I should pay certain of Tim Patrick's invoices, as well as mine out of the escrow account, as opposed to being paid out of Tri-Med's operating account.  It was represented to me that this was due to Anthony Nicolas being hospitalized and he not being able

to manually issue the checks.  As I referenced, this was some time age (*sic*).  As of today, there has been no activity in the escrow account (save and except the checks to Tim and I) for some months.  There have been no presentation of checks for deposit, or checks to distribute.

87.     Almost a month later, on December 23, 2013, Anderson requested Corces pay Tim Patrick another $11,000 from the escrow account.  Instead of Nicholas being hospitalized, this time Anderson told Corces that he was now "in Spain and has been for a month."  Corces and his firm elected to make this improper payment to Tim Patrick Enterprises from the escrow account on or about December 27, 2013.

88.     Corces knew the lack of activity in the escrow account was an issue.  Tri-Med raised approximately $10 million from investors after Corces and his firm agreed to become its escrow agent.  Corces and his firm knew or should have known of Anderson's improper and unlawful conduct as a result of the lack of activity in the escrow account combined with Anderson's instructions to improperly use money that was to be held in trust for investors.

## DEFENDANTS KNOWINGLY ASSISTED INSIDERS TO CONVERT AND MISAPPROPRIATE TRI-MED'S ASSETS

89.     From Tri-Med's inception, Defendants knowingly assisted Anderson, Nicholas, Jr., and Nicholas III to fraudulently convert Tri-Med's assets for their own and others' use in at least nine different ways.  In return for that assistance, Stoel Rives and Johnson accepted approximately $200,000 in legal fees, which they knew originated from defrauded investors.  Stoel Rives' and Johnson's actions are particularly remarkable because they knew Anderson and other Insiders had already defrauded investors, and while Anderson was already wanted in Florida on unrelated charges of felony larceny, they aided and abetted his commission of additional larcenous acts.  Similarly, in return for their assistance, Corces and the Corces Firm received over $15,000 in fees.

**First, Insiders Used Tri-Med's Money To Pay Personal Expenses And Investors' Interest, Which Is Consistent With Their Operation Of A Ponzi Scheme Through Tri-Med.**

90.     Tri-Med operated for approximately ten months before it generated any revenue from the actual purchase of medical accounts receivable.  As such, virtually all expenses, distributions to principals, and distributions to investors during that time period were paid from investors' principal.  Tri-Med raised over $3.5 million from investors during those initial ten months, but it only deposited $826,000 in Marlowe McNabb's trust account, and Tri-Med only used $627,000 of that amount to buy LOPs.  The Insiders misappropriated and diverted the majority of the investors' funds.

91.     For example, Tri-Med received $90,000 from its first investor on November 16, 2011.  During the 21-day period following this investment, Tri-Med did not deposit any funds with Marlowe McNabb or purchase any medical accounts receivable.  Instead, approximately $51,000 of the initial investment was misappropriated and diverted as follows: (1) $22,650 to Anderson directly; (2) $7,200 for Anderson's rental of Unit 1520 at the Ivy, a luxury residence in Minneapolis, Minnesota.; (3) ATM withdrawals totaling $830, primarily at The Ivy; (4) $1,269.91 to Fields BMW in Lakeland, Florida, to pay for Anderson's BMW; (5) $332.75 to StubHub, an online marketplace for tickets to sporting and entertainment events; (6) $13,500 to TMA for commission payments; and (7) $6,000 to Nicholas III.

92.     Even though Tri-Med had not made any investments in medical accounts receivable or made any "profits," the Insiders caused Tri-Med to pay "interest" in the amount of $600 to the first investor on November 30, 2011.  This payment was made from his/her own funds.  During the time period of October 2011 to July 2012, the Insiders caused Tri-Med to distribute over $80,000 to investors as "interest" payments.  Using investors' money to pay purported investment returns is the essence of a Ponzi scheme.

24

93.      As alleged above, Corces and his firm made improper payments to himself and to Tim Patrick Enterprises from money he was supposed to be holding in escrow for investors.  As such, he directly participated in the Insiders' conversion.

94.      Stoel Rives and Johnson also had actual knowledge the Insiders were misappropriating and diverting invested money for their personal and others' benefit, and they facilitated the Insiders' actions.  For example, on August 14, 2013, Dr. Paul Williams, a business partner of Anderson's in Minnesota, sent an email to Anderson, copying Johnson, about the fact that he "borrowed" money from Tri-Med to make improvements to his home.  Dr. Williams wrote, "I wanted to follow up with you one more time regarding the home improvements on the house.  As we discussed on multiple occasions you agreed to let me take a loan from the Tri-Med account for some home improvement projects (just like you were planning on doing for your homes in Florida and Minneapolis.)."  Dr. Williams wrote that he stopped the renovations because it "wasn't the best business decision since you had not started your home improvement projects…."  Johnson and Anderson then discussed how to best respond to Dr. Williams.

95.      Stoel Rives and Johnson knew that the money given to Dr. Williams for home improvements constituted fraud on Tri-Med and its investors.  Indeed, in her own handwritten notes, Johnson wrote: "Tri - Fraud on Co … home improvements on home."

**Second, Stoel Rives And Johnson Knowingly And Substantially Assisted Anderson To Convert And Misappropriate Tri-Med's Assets Through Balance Restaurant Group, LLC.**

96.      Anderson stole $250,000 from Tri-Med to fund a personal investment in a now-defunct restaurant in Alpharetta, Georgia, called Kickshaw Japanese Style Tavern through Balance Restaurant Group, LLC (the "**Balance Group**").  As alleged below, Stoel Rives and Johnson knew Anderson embezzled those funds, but they nevertheless aided and abetted his

fraud and conversion by providing extensive legal services in connection with his investment in the Balance Group.

97.     In January 2013, only six weeks after Stoel Rives and Johnson concluded in the Stoel Rives Memo that Tri-Med was being used to raise money from investors under false pretenses and to engage in securities fraud, Stoel Rives and Johnson nevertheless agreed to represent Anderson – the primary architect of the securities fraud perpetrated through Stoel Rives and Johnson's client, Tri-Med – in connection with the Balance Group.  On or about January 22, 2013, Anderson caused Tri-Med to send Stoel Rives a $2,500 retainer, which he misappropriated from Tri-Med and its investors.  Johnson accepted the representation and retainer on behalf of Stoel Rives, even though she and the firm knew (1) the money came from Tri-Med and its defrauded investors; (2) Tri-Med was not in the restaurant business; and (3) investors were told their money would be used to buy LOPs and were never told their money would be used to fund a restaurant.

98.     Immediately following its retention, Stoel Rives reviewed and revised the Balance Group's operating agreement, which provided that Anderson would personally own 49% of the company.  Anderson ultimately received 4,900 membership interests in the Balance Group for a capital contribution of $980.  As alleged in more detail below, Anderson misappropriated that money from Tri-Med.

99.     Between January and July 3, 2013, Stoel Rives prepared a senior secured promissory note for Anderson in connection with a purported $199,020 "loan" (at 8% annual interest) from Anderson to the Balance Group.  Stoel Rives also prepared a security agreement, which gave Anderson a security interest and lien in the Balance Group's collateral, and it prepared and filed a UCC-1 financing statement to perfect that security interest.  Stoel Rives

revised the operating agreement to reflect this loan and Anderson's security interest.  Stoel Rives also prepared an intercreditor agreement between Anderson and the Balance Group's other owners.

100.    On August 13, 2013, Anderson wired $250,000 from Tri-Med's operating account (ending in ████) at Wells Fargo Bank to the Balance Group's account (ending in ████) at Bank of America.   The next day, the Balance Group transferred $50,000 of that amount to Interventional Pain Center – another entity controlled by Anderson – leaving the Balance Group with a total of $200,000 from Tri-Med.  Of that amount, $199,020 funded the purported loan from Anderson, and the remaining $980 funded Anderson's capital contribution to acquire his 4,900 membership interests.

101.    On February 19, 2014, Anderson transferred an additional $50,000 to the Balance Group through a check from a second Tri-Med account (ending in ████) at Wells Fargo Bank.

102.    In addition to the initial retainer, on or about May 10, 2013, September 10, 2013, and December 2, 2013, Tri-Med paid $4,682.23, $3,412.50, and $8,603.11, respectively, to Stoel Rives for the legal services it and Johnson provided to Anderson in connection with the Balance Group.

103.    Anderson's use of Tri-Med's and investors' money to pay Stoel Rives' and Johnson's fees and to fund the Balance Group amounted to, among other things, embezzlement, conversion, breach of fiduciary duty, and fraud.  Despite actual knowledge that (1) Anderson and other Insiders were violating state and federal securities laws, as set forth in the Stoel Rives Memo; (2) Tri-Med was not in the restaurant business; (3) Anderson paid Stoel Rives and invested in the Balance Group using money misappropriated and diverted from Tri-Med; (4) investors were never told their money would be used to pay Anderson's legal fees or to fund

a restaurant; and (5) Tri-Med would receive no benefit from Anderson's personal investment in the Balance Group, Stoel Rives nevertheless accepted payments from Tri-Med and it and Johnson aided and abetted Anderson's fraudulent and unlawful conduct.

**Third, Stoel Rives And Johnson Knowingly And Substantially Assisted Insiders To Convert And Misappropriate Tri-Med's Assets Through Spine Pain Management, Inc.**

104.    In June 2012, Tri-Med loaned $500,000 to Spine Pain Management, Inc. ("**SPIN**") through a 12% convertible promissory note with a maturity date of March 27, 2014.

105.    In early 2014, Tri-Med entered into an amended 12% convertible promissory note with SPIN, which extended the maturity date of the loan to March 27, 2015.

106.    At the time of the loan, Tri-Med had raised almost $3 million from investors based upon representations that it would use the investors' money to purchase LOPs.  Instead, the insiders used money from dozens of investors to fund the $500,000 loan to SPIN, and to conceal their fraud, the Insiders issued those investors at least 50 "assignments" of fabricated LOPs.

107.    Stoel Rives and Johnson knew that Tri-Med was not in the lending business and that investors were not informed their money would be used to make loans to unrelated companies, but they nevertheless aided and abetted the Insiders' misappropriation and diversion of Tri-Med's assets by providing pertinent legal services and facilitating these transactions.

**Fourth, Stoel Rives And Johnson Knowingly And Substantially Assisted Insiders To Convert And Misappropriate Tri-Med's Assets Through The SIP Entities.**

108.    In April 2013, Tri-Med loaned $390,000 to Spine Injury Physicians, LLC ("**SIP**") and related entities, including Wellness Worx Center, PLLC ("**Wellness Worx**") and Visum Management, LLC ("**Visum**") (collectively, the "**SIP Entities**").  Tri-Med also purchased approximately $80,000 of medical equipment for the SIP Entities.

109.    Insiders used money from dozens of investors – including Plaintiffs Nicholas Sands and Karen A. Deich – to fund the loan and equipment they gave the SIP Entities, and to conceal their fraud, the Insiders issued those investors at least 30 "assignments" of fabricated LOPs.

110.    Stoel Rives drafted the loan's promissory note and security agreement. Stoel Rives also prepared and filed a UCC-1 financing statement to perfect Tri-Med's security interest in the SIP Entities' collateral. Again, Stoel Rives and Johnson knew Tri-Med was not in the lending business and that investors were never told their money would be used to provide money and equipment to unrelated companies. Nevertheless, Stoel Rives and Johnson continued to aid and abet these undisclosed diversions of Tri-Med's and investors' assets. Notably, the SIP Entities filed for bankruptcy in January 2014 and Stoel Rives represented Tri-Med in connection with those proceedings, yet investors were never told of this material event.

111.    Tri-Med also purchased some genuine LOPs from the SIP Entities. In June 2013, however, Stoel Rives and Johnson learned that the SIP Entities sold the same LOPs twice – *i.e.*, to both Tri-Med and to a third party. As such, Stoel Rives and Johnson knew that representations to investors with respect to those LOPs (*e.g.*, that the LOPs were "**AN INDISPUTABLE LIEN UPON THE INDIVIDUAL CASE IT REPRESENTS**" (original emphasis) and were "secured," "guaranteed," "backed," and/or "paid" by major insurance companies) were false, but neither Stoel Rives nor Johnson informed investors of these misrepresentations.

**Fifth Stoel Rives And Johnson Knowingly And Substantially Assisted Insiders To Convert And Misappropriate Tri-Med's Assets Through United Medical.**

112.    In April 2013, Insiders caused Tri-Med to make a loan to an entity called United Medical for the purchase of an MRI scanner.

113.     Stoel Rives and Johnson advised and counseled Insiders regarding the loan. Specifically, Stoel Rives drafted the loan's promissory note and security agreement. They also prepared and filed a UCC-1 financing statement to perfect Tri-Med's security interest in the collateral.  Later, they prepared an amended and restated note and security agreement, which reflected renegotiated terms.

114.     Again, Stoel Rives knew that Tri-Med was not in the business of providing loans to third parties and that its lending activities were never disclosed to investors.

**Sixth, Stoel Rives And Johnson Knowingly And Substantially Assisted Insiders To Convert And Misappropriate Tri-Med's Assets Through GP-13 Enterprises.**

115.     In April 2013, Anderson caused Tri-Med to enter into a joint venture agreement with GP-13 Enterprises, PLLC ("**GP-13**") to purchase and renovate homes in Florida for the purpose of reselling those same homes at a profit.  Anderson funded the joint venture with more than $574,000 he misappropriated from Tri-Med and its investors, including from Plaintiffs Richard Burnham, Deborah Burnham, Karen A. Deich, and Nicholas Sands.  The joint venture used that money to buy three residential properties.  GP-13 did not contribute any capital to the joint venture, but according to the joint venture agreement, it was entitled to split any profits equally with Tri-Med.

116.     Stoel Rives and Johnson became aware of the joint venture no later than June 2013, and thereafter, they provided counsel, advice, and assistance to Anderson in connection with Tri-Med's efforts to purchase and sell residential properties.  Specifically, Johnson analyzed the joint venture agreement, conducted legal research, and participated in real estate closings.

117.     Even though they knew Tri-Med was not in the real estate business and its investors were not told any of their funds would be used to purchase real estate, Stoel Rives accepted payment from Tri-Med for services they provided in connection with the joint venture.

30

118.     The Tri-Med Principals' use of Tri-Med's and investors' money to pay Stoel Rives and to fund the joint venture, amounted to, among other things, breach of fiduciary duty and fraud.  Despite knowing that: (1) Anderson, Nicholas, Jr., and Nicholas III and others had engaged in fraud, as set forth in the Stoel Rives Memo; (2) Tri-Med was not in the real estate business; and (3) investors were not informed that their money would be used to buy and sell real estate, Stoel Rives accepted payments from Tri-Med and provided legal services to permit Anderson and others to engage in this undisclosed venture.  Stoel Rives and Johnson provided substantial assistance to Anderson by counseling and advising him in connection with the joint venture thus aiding and abetting his fraudulent and unlawful conduct.

**Seventh, Stoel Rives And Johnson Knowingly And Substantially Assisted Insiders To Convert And Misappropriate Tri-Med's Assets Through Tri-Med Management, Inc.**

119.     Anderson owned, controlled, and operated Tri-Med Management, Inc., which had a principal address Minnesota.  Despite the similarities in name, Tri-Med Management did not have any legitimate business relationship with Tri-Med.   While Tri-Med Management purportedly operated certain pain clinics Anderson controlled in Minnesota, Tri-Med was the primary source of its revenue.

120.     For example, on December 6, 2012, March 20, 2013, and April 25, 2013, Tri-Med issued three checks totaling $350,000 to Dr. Paul Williams, individually, in order to purportedly buy ten assignments of medical receivables.  Dr. Williams was a partner of Anderson's in connection with pain clinics in Minnesota.  These receivables, however, did not exist and were forged by Anderson to allow him to misappropriate and convert Tri-Med's assets.

121.     Instead, Dr. Williams deposited the $350,000 in an account at Associated Bank and then immediately transferred that amount to Tri-Med Management.   Anderson, his companies, and Dr. Williams used that stolen money for improper purposes.   Indeed,

immediately following the last deposit of $50,000 in April 2013, Tri-Med Management transferred $15,000 to Holly Kwon, Anderson's girlfriend.

122.   Stoel Rives and Johnson counseled and provided legal services to Anderson in connection with Tri-Med Management.   Stoel Rives accepted payment from Tri-Med for services it provided to Anderson in connection with Tri-Med Management.

123.   Stoel Rives and Johnson also created, counseled, and provided legal services to Anderson in connection with JA Management, LLC ("**JA Management**"), which was the successor to Tri-Med Management.

**Eighth, Stoel Rives And Johnson Knowingly And Substantially Assisted Anderson To Convert And Misappropriate Tri-Med's Assets Through JRAM, LLC.**

124.   Stoel Rives and Johnson assisted Anderson to create JRAM, LLC ("**JRAM**") in May 2013, and they thereafter provided various legal services for that entity.   JRAM is controlled by Anderson and owned by his girlfriend, Holly Kwon.

125.   On or about December 20, 2013, Tri-Med purportedly purchased an "LOP" from JRAM for $45,004.42.   In return, JRAM purportedly assigned Tri-Med "receivables" worth $150,014.73.   The receivables purportedly represented medical services JRAM performed for a patient named "Stoel Rives."   Of course, "Stoel Rives" was not a real patient, and it did not incur charges of over $150,000.   Rather, Tri-Med Principals falsified an LOP to transfer the $45,004.42 from Tri-Med to JRAM, an entity controlled by Anderson.   Insiders then caused Tri-Med to assign this fabricated LOP to investors.

**Ninth, Stoel Rives And Johnson Charged Tri-Med For Legal Services That Had Nothing To Do With Tri-Med's Operations As Represented To Investors.**

126.   Stoel Rives and Johnson also conducted due diligence for Anderson with respect to other purported investment opportunities, including Bedloo, LLC ("**Bedloo**") and Back2Sleep, LLC ("**Back2Sleep**").   With respect to Bedloo, Stoel Rives and Johnson conducted extensive

due diligence regarding the company in October 2013, including whether Bedloo was complying with state and federal securities laws.   Stoel Rives also reviewed a note and subscription agreement for Back2Sleep in December 2013.

127.   While Tri-Med and Anderson did not invest in Bedloo or Back2Sleep, Stoel Rives received fees from Tri-Med for conducting due diligence it should never have performed in the first place.  Stoel Rives knew investors were never informed their money would be used to invest in other companies, but it nevertheless performed legal services in connection with these unrelated companies to generate additional fees from Tri-Med.

128.   Stoel Rives' and Johnson's multiple representations of Tri-Med, Anderson, Balance Restaurant, Tri-Med Management, JA Management, JRAM, and other Tri-Med Principals created a conflict of interest for Stoel Rives and Johnson.  They were simultaneously representing an entity it knew had been used by Tri-Med Principals in violation of securities laws, including anti-fraud provisions, and had been defrauded and looted; the individuals using the entity in violation of state and federal securities laws and doing the looting; and the numerous companies into which those individuals diverted investor funds.  Anderson could not waive any such conflict under the pertinent Rules of Professional Conduct.

129.   Under no circumstance should Stoel Rives have accepted payment from Tri-Med or directly charged Tri-Med for these services, especially since it knew the funds used to pay for these services came from the victims of securities fraud.  Stoel Rives' and Johnson's conduct fell below the standard of care expected from independent and experienced counsel.   It failed to act in the best interest of its client, Tri-Med, by accepting payments from Tri-Med for services in connection with unrelated entities and aiding and abetting Anderson with his fraudulent and unlawful conduct.

33

## CLASS REPRESENTATION ALLEGATIONS

130.    Tri-Med has 232 investors, whose total losses, before the calculation of interest, are expected to exceed $10 million.  The class is so numerous that joinder of all members is impracticable.

131.    The class of investors sought to be included in this case are all of those investors who made investments in Tri-Med at any time.

132.    There are questions of law and/or fact common to the class.  Those common questions, include, but are not limited to, whether the legal services provided by Defendants to Tri-Med, Anderson, and other individuals in entities associated with them aided and abetted a fraudulent scheme and enabled Anderson and his co-conspirators to misappropriate millions of dollars in assets from Tri-Med and its investors.

133.    The claims of the Named Investors, as proposed class representatives, are typical of the class claims, and it is anticipated that Defendants will have defenses that are common to all class members.

134.    The Named Investors, as proposed class representatives, will fairly and adequately protect the interests of the class.

135.    Prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class, or Defendants have acted or refused to act on grounds that apply generally to the class.

136.    Questions of law or fact common to the class members predominate over any questions affecting only individual members, and a class action is superior to other available members for fair and efficient adjudication of the controversy.

34

137.    This case meets the requirements of Rule 1.220 of the Florida Rules of Civil Procedure for the reasons set forth above and is suitable for class treatment.

138.    All other conditions precedent to the bringing of this action have occurred or been satisfied or waived.

## COUNT I

### Receiver's Florida Statutes § 726: Uniform Fraudulent Transfer Act Claim – | All Defendants

139.    The Receiver re-alleges each and every allegation contained in Paragraphs 1 through 138 of this Complaint as if set forth fully herein.

140.    Because the Insiders intentionally and wrongfully caused the transfer to Stoel Rives and Johnson of money from Tri-Med as identified in Exhibit B, and of any other asset transferred to them, under the circumstances alleged in this Complaint, Tri-Med, through the Receiver, has a right to repayment of at least that amount from Stoel Rives and Johnson. Johnson is liable as a subsequent transferee, but it is currently not known how much of the money transferred to Stoel Rives was ultimately transferred to Johnson.

141.    Because the Insiders intentionally and wrongfully caused the transfer to Charles Corces P.A. of money from Tri-Med as identified in Exhibit C, and any other asset transferred to Charles Corces P.A., under the circumstances alleged in this Complaint, Tri-Med, through the Receiver, has a right to repayment of at least that amount from Charles Corces P.A.  Corces is liable as a subsequent transferee, but it is currently not known how much of the money transferred to the Corces Firm was ultimately transferred to Corces in his individual capacity.

142.    In light of this right to repayment (and independently because the Insiders' conduct as alleged in this complaint with respect to Tri-Med amounted to embezzlement, breach of fiduciary duty, fraud, and/or other violations of law), Tri-Med has a claim against the Insiders

and consequently is a creditor of the Insiders under FUFTA.  Accordingly, the Insiders are debtors under that act.

143.    The transfers of money that the Insiders caused Tri-Med to make to Defendants were inherently fraudulent because the transfers were made as part of the scheme.

144.    Those transfers were fraudulent under Florida Statutes § 726.105(1)(a) because the Insiders caused Tri-Med to make the transfers with actual intent to hinder, delay, or defraud creditors of the Insiders and Tri-Med.

145.    Those transfers also were fraudulent under Florida Statutes § 726.105(1)(b) because: (1) the Insiders caused Tri-Med to make those transfers; and (2) (i) the Insiders and Tri-Med were engaged or were about to engage in a business or transaction for which their remaining assets were unreasonably small in relation to the business or transaction; or (ii) the Insiders intended that they and/or Tri-Med incur, or believed or reasonably should have believed they would incur, debts beyond their ability to pay as they became due.

146.    Those transfers also were fraudulent under Florida Statutes § 726.106(1) because neither the Insiders nor Tri-Med received a reasonably equivalent value in exchange for those transfers to Defendants, and the Insiders and Tri-Med were insolvent at all relevant times. Defendants also did not receive the transfers in good faith.

147.    On behalf of Tri-Med, from which money was transferred to Defendants, the Receiver is entitled to avoid and recover transfers equal to the money and other transfers that the Insiders caused Tri-Med to pay to Defendants (and to any other pertinent remedy, including those available under Florida Statutes § 726.108).

148.    On behalf of Tri-Med, the Receiver is entitled to avoid and recover those transfers because (1) money was commingled and (2) the Insiders operated Tri-Med as a single, continuous scheme.

WHEREFORE, the Receiver asks this Court to enter judgment against Defendants avoiding transfers from Tri-Med in the amount of money or other transfers received by Defendants, together with interest and costs, and for such other and further relief as the Court may deem just and proper.

## COUNT II
### Receiver's Unjust Enrichment Claim – All Defendants

149.    The Receiver re-alleges each and every allegation contained in Paragraphs 1 through 138 of this Complaint as if set forth fully herein.

150.    This unjust enrichment claim is asserted in the alternative, in the event the statutory remedy asserted in Count I does not provide an adequate remedy at law.

151.    Defendants received a benefit when in furtherance and during the course of the scheme, the Insiders wrongfully caused Tri-Med (as indicated in Exhibits B and C) to transfer money to Defendants in an amount equal to the money and any other transfers received by Defendants.  A portion of that money was ultimately transferred to Johnson and Corces.

152.    Defendants knowingly and voluntarily accepted and retained a benefit in the form of that money.

153.    The circumstances alleged in this complaint render Defendants' retention of that benefit inequitable and unjust so Defendants must pay the Receiver, acting on behalf of Tri-Med, the value of the benefit received.

154.    Defendants have been unjustly enriched at the expense of Tri-Med in the amount of the transfers received by Defendants as detailed in Exhibits B and C (and also in the amount

of any other transfers they received), and Tri-Med, through the Receiver, is entitled to judgment in those amounts.

155.    The Receiver, on behalf of Tri-Med, is entitled to the return of that money through disgorgement or any other applicable remedy.

WHEREFORE, the Receiver asks this Court to enter judgment against Defendants in the amount of money Defendants received from Tri-Med, together with interest and costs, and for such other and further relief as the Court may deem just and proper.

## COUNT III

**Receiver's Professional Negligence/Malpractice Claims – Stoel Rives & Johnson**

156.    The Receiver re-alleges each and every allegation contained in Paragraphs 1 through 138 of this Complaint as if set forth fully herein.

157.    Stoel Rives is a law firm and Johnson is an attorney.  They were both retained by Tri-Med (through Anderson) to provide legal services regarding its "investment program," yet Stoel Rives does not have an office in Florida and Johnson was not admitted to practice law in Florida.

158.    As Tri-Med's attorneys, Stoel Rives and Johnson owed reasonable duties to Tri-Med, including the duties to avoid conflicts of interest and violations of law.  In addition, they owed a duty to reveal confidential information to the extent necessary to prevent the Insiders from committing additional crimes through Tri-Med.

159.    Stoel Rives' and Johnson's conduct as alleged herein (and particularly in paragraphs 89-129) fell below the standard of care expected from independent and experienced counsel.  They neglected or intentionally ignored their duty to avoid conflicts of interest by helping Anderson, a wanted felon in hiding, and other Insiders form entities and engage in

transactions through which the Insiders looted Tri-Med and misappropriated its and investors' assets. They represented both Anderson and his entities, on the one hand, and Tri-Med on the other, but they never disclosed this un-waivable conflict of interest to Tri-Med or its investors.

160.    Stoel Rives and Johnson also neglected or intentionally ignored their duty to perform due diligence on the Insiders and their fraud, especially in connection with drafting the PPM. They knew of the Insiders' fraud, but they took no steps to investigate Anderson or any other Insider. Their inaction led to millions of dollars in losses.

161.    Stoel Rives and Johnson also neglected or intentionally ignored their duty to reveal confidential information to the extent necessary to prevent the Insiders from committing crimes through Tri-Med. They concluded in the Stoel Rives Memo that the Insiders were committing fraud and violating state and federal securities laws, but they took no action to stop those violations, even after learning the Insiders ignored the Stoel Rives Memo, failed to make a rescission offer to investors, and continued raising money from investors through Tri-Med. Had Stoel Rives and Johnson taken affirmative action in December 2012, millions of dollars in losses would have been avoided. At minimum, they should have withdrawn from their representation of Tri-Med and stopped accepting fee payments they knew originated from defrauded investors.

162.    Finally, Stoel Rives and Johnson also neglected or intentionally ignored their duty to avoid their own violations of law because they continued to represent and assist Tri-Med after issuing the Stoel Rives Memo. By doing so, they aided and abetted Tri-Med's violations of state and federal securities laws and allowed the Insiders to perpetrate and perpetuate their scheme. As alleged herein (and particularly in paragraphs 89-129), they also aided and abetted the Insiders fraud, breaches of fiduciary duty, and conversion. As such, Stoel Rives and Johnson did

not merely fail to prevent the Insiders' criminal activity through Tri-Med; rather, they actively facilitated the Insiders' wrongdoing.

163.   Stoel Rives' and Johnson's conduct constituted, at minimum, gross negligence, and it proximately caused millions of dollars in damages to Tri-Med and its investors.

164.   In exchange for facilitating the Insiders' undisclosed and improper activities, Stoel Rives received almost $200,000 in legal fees, and Johnson personally received a portion of that amount.  They knew that money originated from defrauded investors.

WHEREFORE, the Receiver respectfully request judgment against Stoel Rives and Johnson, jointly and severally, for damages in an amount to be determined at trial as well as prejudgment interest, attorneys' fees, the costs of this action, and such other and further relief this Court deems just and proper.

## COUNT IV

### Plaintiffs' Aiding, Abetting, or Participation in Fraud Claim – All Defendants

165.   The Receiver and the Named Investors re-allege each and every allegation contained in Paragraphs 1 through 138 of this Complaint as if set forth fully herein.

166.   Anderson and his co-conspirators engaged in a fraudulent scheme through Tri-Med.  They raised money from investors under false pretenses and then stole that money for their personal and others' benefit and enrichment.

167.   As evidenced by the Stoel Rives Memo, Stoel Rives and Johnson knew that Anderson and his co-conspirators violated state and federal securities laws, including their anti-fraud provisions, by, among other things, not providing full and fair disclosure of information to investors; making inaccurate or misleading representations; advertising the Tri-Med "investment program" in newspapers and on Tri-Med's website; failing to register the securities and certain

entities and individuals; and paying unlawful commissions.   As specifically alleged in paragraphs 80-88, Stoel Rives and Johnson also knew the Insiders ignored the Stoel Rives Memo and continued operating in violation of the law.   Stoel Rives and Johnson aided and abetted the Insider's securities fraud by continuing to provide legal services to Tri-Med as alleged herein, including but not limited to their development of the PPM.

168.   In addition, as alleged in paragraphs 89-129, the Tri-Med Principals' and other Insiders' fabrication of LOPs to convert and misappropriate Tri-Med's assets for their personal use, to fund other entities, including Tri-Med Management, JRAM, and Balance Restaurant, and to fund undisclosed ventures, including investments in real estate and loans to third parties, amounted to, among other things, fraud on Tri-Med and its investors.   According to the Stoel Rives Memo, Stoel Rives and Johnson knew Tri-Med was only allowed to "engage[] in the business of purchasing letters of protection from surgical centers or other providers of medical care...in Florida" and that investors were never told their money would be used to buy houses, make loans, fund unrelated companies, or for any purpose other than to buy LOPs.   But they nevertheless aided and abetted those activities as specifically alleged in paragraphs 89-129.   To make matters worse, the Insiders paid Stoel Rives' and Johnson's legal fees for these undisclosed and unrelated activities with Tri-Med's and investors' money, which Stoel Rives and Johnson knew had been procured through fraud.

169.   Stoel Rives' and Johnson's legal and other services furthered a fraudulent scheme that enabled Anderson and his co-conspirators to misappropriate millions of dollars from Tri-Med.   Stoel Rives' and Johnson's counseling, advising, and assisting Anderson, Nicholas, Jr., and Nicholas III in connection with the undisclosed activities alleged herein aided and abetted

their fraudulent and unlawful conduct.  In exchange for aiding and abetting the scheme, Stoel Rives received almost $200,000 in legal fees, and Johnson received a portion of that amount.

170.   Similarly, the Tri-Med Principals' conduct of using monies held in trust to pay Charles Corces, P.A. and Tim Patrick Enterprises amounted to, among other things, embezzlement, conversion, breach of fiduciary duty, and fraud.

171.   Defendant Charles Corces, P.A. and Charles Corces knew that it was unlawful and improper to use the funds held in trust to pay Charles Corces, P.A. and Tim Patrick Enterprises, but they did so nevertheless.

172.   Defendant Charles Corces, P.A. and Defendant Charles Corces assisted a fraudulent scheme that enabled and assisted Anderson and his co-conspirators to misappropriate millions of dollars in assets from Tri-Med.  Defendant Charles Corces, P.A. and Charles Corces assistance, as alleged in paragraphs 80-88, aided and abetted the Insiders fraudulent and unlawful conduct.

WHEREFORE, the Receiver and the Named Investors respectfully request judgment against Defendants, jointly and severally, for damages in an amount to be determined at trial as well as prejudgment interest, attorneys' fees, the costs of this action, and such other and further relief this Court deems just and proper.

## COUNT V

### Plaintiffs' Aiding, Abetting, or Participation in Breaches of Fiduciary Duties Claim – All Defendants

173.   The Receiver and the Named Investors re-alleges each and every allegation contained in Paragraphs 1 through 138 of this Complaint as if set forth fully herein.

174.   Anderson, Nicholas, Jr., and Nicholas III owed fiduciary duties to Tri-Med and its investors.

42

175.   Anderson, Nicholas, Jr., and Nicholas III breached their fiduciary duties to Tri-Med and its investors as alleged herein (and particularly in paragraphs 89-129) by paying third parties, including Defendant Charles Corces, P.A. and Tim Patrick Enterprises, with funds to be held in trust for investors, misappropriating and converting Tri-Med's funds for their own and others' use, by failing to use reasonable care in operating and managing the company, by failing to operate it in a reasonably prudent manner, and by failing to operate it in compliance with all applicable laws and regulations.

176.   Defendants knew that Anderson, Nicholas, Jr., and Nicholas III owed fiduciary duties to Tri-Med and its investors.   Defendants also knew the Tri-Med Principals were breaching their fiduciary duties to Tri-Med and its investors.

177.   Stoel Rives and Johnson knowingly or recklessly aided, abetted, or participated in these breaches of fiduciary duties (as alleged in paragraphs 89-129) by forming the entities and arranging the transactions through which Anderson, Nicholas, Jr., and Nicholas III looted Tri-Med and misappropriated investors' money.   They also affirmatively assisted the Insiders to operate Tri-Med in violation of the law by continuing to provide legal services even after learning the Insiders engaged in fraud and ignored the Stoel Rives Memo.

178.   Defendant Charles Corces, P.A. and Defendant Charles Corces knowingly or recklessly aided, abetted, or participated in these breaches of fiduciary duties (as alleged in paragraphs 80-88) by allowing the Insiders to misuse the escrow account.

179.   Stoel Rives accepted payment from Tri-Med in order to perform legal services for Anderson and the entities he owned and controlled, which assisted Anderson and others to perpetrate and perpetuate their fraudulent scheme though Tri-Med in breach of their fiduciary duties.

WHEREFORE, the Receiver and the Named Investors respectfully request judgment against Defendants, jointly and severally, for damages in an amount to be determined at trial as well as prejudgment interest, attorneys' fees, the costs of this action, and such other and further relief this Court deems just and proper.

## COUNT VI

### Plaintiff's Aiding, Abetting, or Participation in Conversion Claim – All Defendants

180.    The Receiver and the Named Investors re-allege each and every allegation contained in Paragraphs 1 through 138 of this Complaint as if set forth fully herein.

181.    Tri-Med and its investors owned, possessed, or had the right to immediate possession of personal property, including money.

182.    Anderson and his co-conspirators wrongfully exercised dominion and control over such property by misappropriating and converting millions of dollars in such property from Tri-Med, thereby causing damages to Tri-Med and its investors.

183.    By their conduct alleged herein (and particularly in paragraphs 80-88 and 89-129), Defendants knowingly aided, abetted, or participated in this misappropriation and conversion of millions of dollars in property. Defendants were aware that Anderson and his co-conspirators were wrongfully exercising dominion and control over Tri-Med's and the investors' property.

184.    The wrongful conversion of property by Anderson and his co-conspirators was the proximate cause of actual damages to Tri-Med and its investors.

WHEREFORE, the Receiver respectfully request judgment against Defendants, jointly and severally, for damages in an amount to be determined at trial as well as prejudgment interest,

attorneys' fees, the costs of this action, and such other and further relief this Court deems just and proper.

## COUNT VII

### Plaintiffs' Civil Conspiracy Claim – All Defendants

185.    The Receiver and the Named Investors re-allege each and every allegation contained in Paragraphs 1 through 138 of this Complaint as if set forth fully herein.

186.    Defendants conspired with Anderson, Nicholas Jr., and Nicholas III, to commit the wrongful conduct described herein, including breaches of fiduciary duties, participation in a fraudulent scheme, and conversion.  Defendants are responsible for all wrongdoing done by each of the other members of the conspiracy, including Anderson, Nicholas Jr., Nicholas III, and others, in furtherance of the unlawful conspiracy and enterprise.  In particular, Defendants are responsible for Anderson's, Nicholas Jr.'s, Nicholas III's, and their co-conspirators' misappropriation of millions of dollars in assets from Tri-Med.

187.    There was a meeting of the minds between Anderson, Nicholas Jr., Nicholas III, and others to defraud the investors.  This meeting of the minds grew to include other participants, including Defendants.  Johnson and Stoel Rives joined the conspiracy and had a meeting of the minds with Anderson and his co-conspirators no later than January 2013 when she and Stoel Rives accepted money from Tri-Med in order to perform legal services for Anderson in connection with the Balance Group.  In this meeting of the minds, Stoel Rives and Johnson agreed to assist Anderson and his co-conspirators with the fraud, by, among of things, assisting Anderson and others to misappropriate and convert Tri-Med's and investors' assets.

188.    Defendant Charles Corces, P.A. and Defendant Charles Corces joined the conspiracy and had a meeting of the minds with Anderson and his co-conspirators no later than

April 2013 when they elected to serve as escrow agent and August 2013 when they made unlawful and improper payments to Tim Patrick Enterprises.  In this meeting of the minds, Defendant Charles Corces, P.A. and Defendant Charles Corces agreed to assist Anderson and his co-conspirators with the fraud, by, among of things, assisting Anderson and others to misappropriate and convert Tri-Med's assets.

189.    Defendants therefore knowingly combined together with Anderson and the co-conspirators in assisting Anderson, Nicholas Jr., and Nicholas III perpetuate the fraud.

190.    As described herein (and particularly in paragraphs 89-129), Stoel Rives and Johnson took various overt acts designed to assist Anderson, Nicholas Jr., and Nicholas III in further of the scheme, including counseling, advising, and assisting principals of Tri-Med with the following matters that were not disclosed to investors:  (1) a joint venture to purchase real estate with Tri-Med investor funds although they knew that Tri-Med investors were not informed their money would be used to buy real estate; (2) the preparation of security agreements, promissory notes, and UCC filings for loans made with Tri-Med investor funds to third party companies, although they knew that Tri-Med investors were not informed their money would be used for such loans; (3) Anderson's personal investment in the Balance Group using Tri-Med's money, for which Stoel Rives' fees were paid with defrauded Tri-Med investor funds, although it knew that Tri-Med investors were not informed their money would be used for such an investment or to pay legal fees for such matters and that the money had been raised on behalf of Tri-Med through fraud; (4) due diligence on other possible investments for Anderson using Tri-Med investor funds, for which Stoel Rives' fees were paid with Tri-Med investor funds, although it knew that Tri-Med investors were not informed their money would be used for any such possible investments or to pay legal fees for such matters; and (5) the recovery of monies that

46

had been unlawfully transferred to Dr. Paul Williams, which Stoel Rives and Johnson knew constituted fraud upon Tri-Med.

191.    As described herein, Defendant Charles Corces, P.A. and Defendant Charles Corces took various overt acts designed to assist Anderson in furtherance of the scheme, including improperly paying Charles Corces, P.A. and Tim Patrick Enterprises.   Defendant Charles Corces, P.A. and Defendant Charles Corces knew of the lack of activity in the escrow account, but nevertheless agreed to assist Anderson in misappropriating and converting assets earmarked for investors, lenders, or to fund medical procedures.

192.    By doing so, Defendants acted pursuant to their meeting of the minds with Anderson and other co-conspirators in pursuit of the common purpose of the conspiracy:   to perpetuate a fraud upon the investors.

193.    Defendants' conspiracy with the Tri-Med Principals and others to breach fiduciary duties, participate in a fraudulent scheme, and convert Tri-Med's property is a proximate cause of actual damages to Tri-Med and its investors.

194.    Defendants' actions in furthering the conspiracy to commit fraud were taken during the conspiracy's operation.   Indeed, Defendants' actions were taken to protect and advance the scheme so it could continue and Tri-Med could continue paying fees to Defendants.

195.    Defendants' actions were part of a continuing activity that was illegal in nature and essential to furthering the survival of an ongoing fraudulent scheme.  But for the overt acts taken by members of the conspiracy to further the conspiracy's objectives as described herein, Anderson and his co-conspirators would not have been able to execute the scheme and millions of dollars in damages to Tri-Med and its investors would have been avoided.

WHEREFORE, the Receiver and the Named Investors respectfully request judgment against Defendants, jointly and severally, for damages in an amount to be determined at trial as well as prejudgment interest, attorneys' fees, the costs of this action, and such other and further relief this Court deems just and proper.

**COUNT VIII**

**Receiver's Breach of Contract Claim – Charles Corces, P.A.**

196.    The Receiver re-alleges each and every allegation contained in Paragraphs 1 through 138 of this Complaint as if set forth fully herein.

197.    Tri-Med and Defendant Charles Corces, P.A. entered into the Escrow Agreement on or about April 5, 2013.

198.    Defendant Charles Corces, P.A. agreed to, among other things, hold funds in trust in order to pay investors, lenders, or to fund medical procedures.  Defendant Charles Corces, P.A. was required to receive written evidence from Anderson or Nicholas III for the purpose of each disbursement that "will enable the Escrow Agent to attribute the disbursement to a particular investor and/or lender, or the funding of a particular medical procedure."

199.    Defendant Charles Corces, P.A. breached the terms of the Escrow Agreement by paying itself and Tim Patrick Enterprises from the escrow account.

200.    Defendant Charles Corces, P.A. also breached the terms of the Escrow Agreement by failing to obtain written evidence from Anderson or Nicholas III for the purpose of each disbursement that "will enable the Escrow Agent to attribute the disbursement to a particular investor and/or lender, or the funding of a particular medical procedure."

201.    Tri-Med has been damaged as a result of the breach.

WHEREFORE, the Receiver asks this Court to enter judgment against Defendant Charles Corces, P.A. for damages in an amount to be determined at trial as well as prejudgment interest, attorneys' fees, the costs of this action, and such other and further relief this Court deems just and proper.

## COUNT IX

### Receiver's Negligence Claim – Charles Corces, P.A.

202.    The Receiver re-alleges each and every allegation contained in Paragraphs 1 through 138 of this Complaint as if set forth fully herein.

203.    As Tri-Med's escrow agent, Defendant Charles Corces, P.A. and Defendant Charles Corces owed it, at minimum, a duty of reasonable care.

204.    Defendant Charles Corces, P.A. and Charles Corces knew or should have known that it was unlawful and improper to use the funds held in trust to pay Charles Corces, P.A. and Tim Patrick Enterprises, but they did so nevertheless.

205.    Defendant Charles Corces, P.A. and Defendant Charles Corces also knew of the lack of activity in the escrow account but took no steps to investigate the reasons for the lack of activity.  Tri-Med was raising millions of dollars from investors but receiving no payments from medical providers because the Insiders did not use the investors' money to purchase LOPs. Instead, they diverted and misappropriated the investors' money as alleged in paragraphs 89-129. Had Defendant Charles Corces, P.A. and Defendant Charles Corces complied with their duty of reasonable care, they would have discovered those diversions and prevented millions in losses.

206.    Defendant Charles Corces, P.A. and Defendant Charles Corces breached their duties to Tri-Med as alleged above, thereby directly and proximately damaging Tri-Med.

WHEREFORE, the Receiver asks this Court to enter judgment against Defendant Charles Corces, P.A. and Defendant Charles Corces, jointly and severally, for damages in an amount to be determined at trial as well as prejudgment interest, attorneys' fees, the costs of this action, and such other and further relief this Court deems just and proper.

## NOTICE OF INTENT TO SEEK PUNITIVE DAMAGES

The actions of Defendants, as described in this Complaint, were intentional and/or grossly negligent and entitle Plaintiffs to seek punitive damages. Notice is hereby given that Plaintiffs will, at the appropriate time, request the Court to include a claim for punitive damages in this case pursuant to the procedures established in §768.22 Fla. Stats.

## JURY TRIAL DEMAND

The Receiver and the Named Investors demand a jury trial on all claims.

s/Gianluca Morello
Gianluca Morello (Trial Counsel)
Florida Bar No. 034997
gmorello@wiandlaw.com
Michael S. Lamont
Florida Bar No. 0527122
mlamont@wiandlaw.com
Jared J. Perez
Florida Bar No. 0085192
jperez@wiandlaw.com
WIAND GUERRA KING P.A.
5505 West Gray Street
Tampa, FL 33609
Tel. 813-347-5100/Fax 813-347-5155

*Attorneys for the Receiver, Burton W. Wiand*

And

Robert W. Pearce, Esquire
Florida Bar No. 344575
pearce@rwpearce.com
Robert Wayne Pearce, P.A.
1499 West Palmetto Park Road, Suite 400

Boca Raton, FL  33486
Tel. (561) 338-0037/Fax. (561) 338-9310

*Counsel for the Named Investors*